

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

CAROLE VAN TASSELL, ERIC DUNN,   )
and JANET CASINOVER, individually and  )
on behalf of all others similarly situated,  )
  )
  )
      Plaintiffs,   )
  )    **No. 10 C 2675**
    v.   )
  )
UNITED MARKETING GROUP, LLC, an   )    **Judge Ruben Castillo**
Illinois limited liability company;   )
PERMISSION INTERACTIVE, INC., a   )
Delaware corporation; PIKES PEAK DIRECT  )
MARKETING, INC., a Delaware corporation;  )
and TAYLOR GIFTS, INC., a Pennsylvania  )
corporation,   )
  )
      Defendants.   )

## MEMORANDUM OPINION AND ORDER

Carole Van Tassell ("Van Tassell"), Eric Dunn ("Dunn"), and Janet Casinover

("Casinover") (collectively, "Plaintiffs") bring this putative class action against United

Marketing Group, LLC ("United Marketing"), Taylor Gifts, Inc. ("Taylor Gifts"), Pikes Peak

Interactive, Inc. ("Pikes Peak"), and Permission Interactive, Inc. ("Permission Interactive")

(collectively, "Defendants") for alleged violations of state and federal law. (R. 1, Compl.)

Presently before the Court are four motions. First, United Marketing and Taylor Gifts, in a

motion joined in part by Pikes Peak, move to dismiss the first amended complaint pursuant to

Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and alternatively to compel this action to

arbitration and to stay further proceedings pursuant to the Federal Arbitration Act ("FAA"), 9

U.S.C. § 1 *et seq.* (R. 18, Defs.' Mot.; R. 19, Defs.' Mem.) Second, Permission Interactive

seeks to join the motion filed by United Marketing and Taylor Gifts. (R. 45.) Third, Permission

Interactive moves for partial dismissal of the first amended complaint as it pertains to Permission

Interactive pursuant to Rule 12(b)(6). (R. 47, PI's Mot.; R. 48, PI's Mem.) Fourth, Pikes Peak

requests the Court to compel arbitration and stay the current proceedings as they pertain to Pikes

Peak pursuant to the FAA. (R. 24, PP's Mot.; R. 35, PP's Mem.). (*Id.*) The Court grants

Permission Interactive's motion to join the motion to dismiss, and for the reasons stated below,

Defendants' joint motion to dismiss is granted in part and denied in part; Defendants' joint

motion to compel arbitration is entered and continued; Permission Interactive's motion to

dismiss is granted; and Pikes Peak's motion to compel arbitration is denied.[1]

## RELEVANT FACTS

### I.    Facts common to all Plaintiffs

This case arises from Plaintiffs' online purchase of products from websites owned by

Permission Interactive, Pikes Pike, and Taylor Gifts (collectively, "Merchant Defendants"). (R.

10, First Am. Compl. ¶¶ 1-2.) Plaintiffs allege that after making a purchase on the Merchant

Defendants' websites, the Merchant Defendants transmitted Plaintiffs' credit or debit card

information to United Marketing without their knowledge or authorization. (*Id.* ¶¶ 18-20.) With

this information, United Marketing enrolled Plaintiffs in a negative-option membership program

such as Buyer's Edge, MyAdvisor, Simply Mine, TechXperts for Consumer, Perfect Home, and

Money Ahead (the "Membership Programs"). (*Id.* ¶¶ 16-18.) According to Plaintiffs, United

Marketing enrolled Plaintiffs in a trial Membership Program for $1, and then after a thirty-day

waiting period, began charging each Plaintiff between $10 and $20 monthly until they discovered

---

[1] Pikes Peak does not join the motion to dismiss filed by United Marketing and Taylor Gifts as it
pertains to grounds for dismissal pursuant to Rule 12(b)(6). (R. 33 at 2.) For ease of reference,
however, the Court will refer to this motion and its supporting memorandum as "Defendants'
Motion."

2

the unauthorized charges. (*Id.* ¶ 18.) In some cases, United Marketing enrolled consumers in multiple Membership Programs at once. (*Id.* ¶ 19.)

Plaintiffs aver that the Membership Programs are wholly unrelated to the retail purchases made by consumers on the Merchant Defendants' websites, and that most "enrolled" consumers are entirely unaware that they have been enrolled in the Membership Programs. (*Id.* ¶¶ 17, 20.) The Membership Program purports to provide discounts and benefits to its enrolled members, but because most consumers are unaware of their membership, they are repeatedly billed by United Marketing while receiving nothing in return. (*Id.* ¶ 20.) Plaintiffs claim that because consumers are unaware that they have been enrolled in a Membership Program and the monthly fee charged by United Marketing is relatively small, consumers often fail to discover these charges for several months. (*Id.* ¶ 21.)

Plaintiffs allege that Defendants have worked in deliberate cooperation with each other and are aware of the deceptive nature of this business model. (*Id.* ¶¶ 4, 22.) Plaintiffs claim that for each consumer enrolled in a United Marketing Membership Program, the Merchant Defendant that transferred the consumer's financial information receives a share of the charge. (*Id.* ¶ 20.) Plaintiffs also aver that Defendants have received numerous complaints from consumers disputing the authorization for these charges. (*Id.* ¶ 22.) The Merchant Defendants, however, disavow any knowledge of, or responsibility for, these practices. (*Id.*)

## II. Facts specific to Van Tassell, Dunn, and Casinover

### A. Van Tassell

Van Tassell is a citizen of New York. (*Id.* ¶ 6.) In or around November of 2009, she purchased a product from a website owned by Pikes Peak and provided her credit card

3

information to make that purchase. (*Id.* ¶ 24.) Shortly thereafter, Van Tassell was billed a recurring monthly charge of $14.95 for "UMG*MINE." (*Id.* ¶ 25.) When she discovered these charges after several months, Van Tassell called United Marketing to inquire about the charges. (*Id.* ¶ 27.) A United Marketing customer representative told Van Tassell that she had been enrolled in the United Marketing "Simply Mine" Membership Program following her purchase from the Pikes Peak's website. (*Id.*) Van Tassell disputed that she had enrolled in any Membership Program and insisted that she had not authorized either United Marketing or Pikes Peak to bill her for the Program. (*Id.* ¶ 28.) After her continued protests, United Marketing agreed to cancel the ongoing Membership Program but refused to fully refund all the charges United Marketing had "crammed" onto Van Tassell's credit card account.[2] (*Id.* ¶ 29.) Van Tassell maintains that she never requested or authorized Pikes Peak to transfer her confidential credit card information to United Marketing, nor requested or authorized United Marketing to repeatedly charge her credit card. (*Id.* ¶ 30.)

### B. Dunn

Dunn is a citizen of Virginia. (*Id.* ¶ 7.) In or around March 2009, Dunn made a purchase from a website owned and operated by Taylor Gifts and provided his credit card information for that purpose. (*Id.* ¶ 31.) Shortly thereafter, Dunn was billed a recurring monthly charge of $11.99 for "UMG*EDGE." (*Id.* ¶ 32.) Like Van Tassell, Dunn did not discover these charges for several months and did not know the origin of these charges. (*Id.* ¶¶ 32-33.) When Dunn

---

[2] According to the complaint, "[c]ramming is the process by which charges for products or services are placed onto a consumer's bank, credit card, or other account(s) without that consumers knowledge or authorization. Such charges are often depicted or disguised as unidentifiable line items and are relatively small. As a result of these characteristics, crammed charges typically go unnoticed for a period of time." (*Id.* at 6, n.1.)

4

contacted United Marketing to inquire about the charges, he was told that he had been enrolled in the United Marketing "Buyer's Edge" Membership Program following his purchase from Taylor Gifts. (*Id.* ¶ 34.) Dunn disputed that he had enrolled in the "Buyer's Edge" Membership Program and stated that he had never authorized either United Marketing or Taylor Gifts to bill him for such service. (*Id.* ¶ 35.) United Marketing agreed to cancel the ongoing Membership Program after Dunn's repeated protests, but refused to fully refund all of the charges on Dunn's credit card account. (*Id.* ¶ 36.) Dunn contends that he never requested or authorized United Marketing to charge his credit card, nor requested or authorized Taylor Gifts to transfer his credit card information to United Marketing. (*Id.* ¶ 37.)

### C.   Casinover

Casinover is a citizen of New York. (*Id.* ¶ 8.) She purchased a product from a website owned and operated by Permission Interactive and provided her debit card information to complete the transaction. (*Id.* ¶ 38.) Soon after this purchase, Casinover began being charged $14.95 a month for "UMG*EDGE" and $14.95 a month for "UMG*MYAD." (*Id.* ¶ 39.) Casinover called United Marketing numerous times to inquire about the origin of these charges, but was always placed on hold. (*Id.* ¶ 41.) She never spoke with a United Marketing representative about these unknown charges. (*Id.*) She finally canceled her debit card in order to stop the recurring United Marketing charges. (*Id.* ¶ 42.) On information and belief, Casinover alleges that United Marketing enrolled her in its Membership Programs following her purchase from Permission Interactive, which transferred her confidential debit card information to United Marketing without her authorization, which, in turn, repeatedly charged her debit card without her authorization. (*Id.* ¶¶ 43-44.)

5

## PROCEDURAL HISTORY

On April 30, 2010, Defendants removed this case to federal court pursuant to 28 U.S.C. §§ 1332, 1441, 1446 and 1453. (R. 1, Not. of Removal.) Plaintiffs filed an amended complaint (the "complaint") on October 28, 2010. (R. 10, First Am. Compl.) In their complaint, Plaintiffs assert eight claims: (1) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 Ill. Comp. Stat. 505/1 *et seq.* (Count I); (2) violation of the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693e (Count II); (3) violation of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510 *et seq.* (Count III); (4) breach of contract (Count IV); (5) unjust enrichment (in the alternative to breach of contract) (Count V); (6) unjust enrichment (Count VI); (7) fraud in the inducement (Count VII); and (8) conspiracy to commit fraud (Count VIII). (*Id.*)

On December 13, 2010, Taylor Gifts and United Marketing filed a motion to dismiss the amended complaint. (R. 18, Defs.' Mot.) Pikes Peak subsequently joined this motion in part, (R. 33, R. 44), and Permission Interactive moved to join the motion in its entirety. (R. 45.) In their supporting memorandum, Defendants argue that dismissal of this case is appropriate for three reasons. First, Defendants maintain that Plaintiffs' claims are moot because Defendants have satisfied Plaintiffs' demand for relief. (R. 19, Defs.' Mem. at 1). Second, Defendants claim that Plaintiffs cannot establish the foundational prerequisites of their claims because United Marketing's online enrollment process is not deceptive as a matter of law. (*Id.*) Defendants also contend that Plaintiffs' first three counts fail as a matter of law for additional reasons. (*Id.*) Finally, in the alternative, Defendants argue that Plaintiffs' claims are subject to binding arbitration. (*Id.*)

6

Pikes Peak filed a motion to compel arbitration and to dismiss or stay these proceedings on December 13, 2010. (R. 24, PP's Mot.) In their supporting memorandum, Pikes Peak argues that Van Tassel entered into a contract with Pikes Peak through her online purchase from a website owned and operated by Pikes Peak. (R. 35, PP's Mem. at 1.) As part of that contract, Pikes Peak contends, Van Tassell agreed to submit any disputes to binding arbitration, and thus she must be compelled to bring her claims in arbitration. (*Id.*)

On January 7, 2011, Permission Interaction moved to dismiss Plaintiffs' EFTA claim in Count II, as well as the portion of Plaintiffs' ICFA claim alleging a violation of the EFTA, as alleged against Permission Interactive. (R. 47, PI's Mot. at 1.) Permission Interactive argues that dismissal of Count II is appropriate pursuant to Rule 12(b)(6) because Permission Interactive did not initiate any "electronic fund transfer from a consumer's account" as required by the EFTA. (*Id.*) Permission Interactive also seeks attorneys' fees and costs pursuant to Section 1693m(f) of the EFTA. (*Id.*)

The Court first addresses Defendants' motions to dismiss pursuant to Rule 12(b)(1) and 12(b)(6), and then turns to the motions to compel arbitration.

## DISCUSSION

**I. Defendants' joint Rule 12(b)(1) motion to dismiss**

### A. Legal Standards

Rule 12(b)(1) of the Federal Rules of Civil Procedure requires dismissal of a claim over which the federal court lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(6). In reviewing a motion challenging the sufficiency of the allegations regarding subject matter jurisdiction, the court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in

favor of the plaintiff. *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999); *see also Apex Digital*, 572 F.3d at 443-44 (labeling a motion to dismiss for lack of subject matter jurisdiction in which the court need only look to the complaint a "facial challenge"). If the defendant denies or controverts the truth of the jurisdictional allegations, however, "the district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Apex Digital*, 572 F.3d at 443 (internal quotation marks and citation omitted) (referring to such a motion to dismiss a "factual challenge"). Once such evidence is offered, "[t]he presumption of correctness that we accord to a complaint's allegations falls away," and the plaintiff bears the burden of coming forward with competent proof that jurisdiction exists. *Id.*

### B.   Defendants' Rule 12(b)(1) motion to dismiss

Defendants contend that Plaintiffs' claims are moot and should be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). (R. 19, Defs.' Mem. at 4-6.) Article III of the Constitution limits the federal courts to adjudicating actual "cases" or "controversies." U.S. Const. art. III, § 2. This requires that a party must have standing for each form of relief sought during every stage of litigation. *Parvati Corp. v. City of Oak Forest*, 630 F.3d 512, 516 (7th Cir. 2010). When a party loses standing during the litigation due to intervening events, "the inquiry is . . . one of mootness." *Id.* (citation omitted). In other words, mootness is "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 538 U.S. 167, 185 (2000).

8

It is well settled that "[a] dispute becomes moot when the dispute between the parties no longer rages, or when one of the parties loses his personal interest in the outcome of the suit." *Holstein v. City of Chi.*, 29 F.3d 1145, 1147 (7th Cir. 1994) (citations omitted). A plaintiff may lose her "personal interest" in the suit when the defendant "offers to satisfy the plaintiff's entire demand" because "there is no dispute over which to litigate, and a plaintiff who refuses to acknowledge this loses outright, under Fed. R. Civ. P. 12(b)(1), because [the plaintiff] has no remaining stake." *Id.* Importantly, the offer of relief must be complete: "obviously the rejection of an offer of less than the complete relief sought does not prove that there is no dispute between the litigants." *Greisz v. Household Bank (Ill.)*, 176 F.3d 1012, 1015 (7th Cir. 1999).

Here, Defendants contend that because United Marketing refunded the subscription fees that Plaintiffs were charged, there is no dispute over which to litigate.[3] (R. 19, Defs.' Mem. at 6.) As a result, Defendants argue, Plaintiffs' claims are moot. (*Id.*) Plaintiffs, on the other hand, argue that their demand "goes well beyond the unauthorized subscription fees charged to them." (R. 68, Pls.' Resp. at 3.) According to the complaint, Plaintiffs seek, for themselves and on behalf of others: (1) actual damages of the return of the subscription fees charged by United Marketing; (2) the lost interest resulting from the wrongful charges; (3) statutory damages; (4) costs; and (5) reasonable attorneys' fees. (R. 10, First Am. Compl. ¶¶ 66, 67, 71, 77, 94, 102.) Thus, Plaintiffs contend, Defendants have failed to satisfy Plaintiffs' "entire demand" through the return of just the subscription fees. (R. 68, Pls.' Resp. at 4.)

---

[3] Although it is not clear that United Marketing has fully refunded Plaintiffs' the charges for the subscription fees, the Court assumes for the purposes of this motion that the fees have been fully refunded to the Plaintiffs.

In support of this argument, Plaintiffs cite *Gates v. Towery*, 430 F.3d 429 (7th Cir. 2005). In *Gates*, the Seventh Circuit determined that a putative class action was not mooted by the defendant city's tendering to the two named plaintiffs the money that had been seized by the police when the plaintiffs were arrested. *Id.* The Seventh Circuit reached this conclusion because the city's tender did not include the complete relief sought by the plaintiffs, including costs, interest, nominal damages, and compensatory damages. *Id.* Specifically, the Seventh Circuit held that "[a] tender is insufficient unless it makes the plaintiff whole and thus must include the filing fees and other costs." *Id.* at 431. In light of *Gates*, the Court concludes that Defendants' tender in this case was insufficient to moot Plaintiffs' claims because it did not "make[] the plaintiff[s] whole." Accordingly, dismissal on mootness grounds is therefore improper at this time.

To avoid this conclusion, Defendants point to *Lewis v. Continental Bank Corp.*, in which the Supreme Court held that a request for attorneys' fees was insufficient to save the plaintiff's claims from dismissal. 494 U.S. 472, 480 (1990) ("This interest in attorney's fees is, of course, insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim . . . Where on the face of the record it appears that the only concrete interest in the controversy has terminated, reasonable caution is needed to be sure that mooted litigation is not pressed forward . . . solely in order to obtain reimbursement of sunk costs") (citations omitted). Defendants' reliance on this cases is misplaced, however, because Plaintiffs seek relief other than just attorneys' fees and "sunk costs."[4] Defendants ignore Plaintiffs' unmet requests,

---

[4] The Court acknowledges that these cases are arguably in tension with certain aspects of *Gates*. However, the Seventh Circuit acknowledged this line of cases in *Gates* before reaching its conclusion that a tender is insufficient to moot a plaintiff's claims unless it makes the plaintiff whole and therefore must include fees and costs. *Gates*, 430 F.3d at 430-31.

including interest, and merely argue, without citation to any authority, that the refunds provided

to Plaintiffs moot all of their claims, including claims for statutory damages. (R. 72, Defs.'

Reply at 4.) Contrary to Defendants' position, however, "[a] defendant cannot simply assume

that its legal position is sound and have the case dismissed because it has tendered everything it

*admits* is due." *Gates*, 430 F.3d at 432. Instead, the Seventh Circuit has made it clear that

"[m]ootness occurs when no more relief is possible," *id.*, and that point has not been reached in

this case.[5]

## II.     The motions to dismiss pursuant to Rule 12(b)(6)

### A.     Legal Standards

A motion under Rule 12(b)(6) "challenges the sufficiency of the complaint to state a

claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge*

*No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). In ruling on a motion to dismiss, the Court construes

the complaint "in the light most favorable to the nonmoving party, accept[ing] well-pleaded facts

as true, and draw[ing] all inferences in her favor." *Reger Dev. LLC v. Nat'l City Bank*, 592 F.3d

759, 763 (7th Cir. 2010). To survive a motion to dismiss for failure to state a claim, the

complaint must overcome "two easy-to-clear hurdles": (1) "the complaint must describe the

claim in sufficient detail to give the defendant fair notice of what the claim is and the grounds on

which it rests"; and (2) "its allegations must plausibly suggest that the plaintiff has a right to

relief, raising that possibility above a 'speculative level[.]'" *Tamayo v. Blagojevich*, 526 F.3d

---

[5] By arguing that all of Plaintiffs' claims are moot, Defendants fail to differentiate between any
of Plaintiffs' claims, aside from a brief footnote in their reply brief without any citation to
authority. (R. 72, Defs.' Reply at 4, fn.4.) Given the undeveloped nature of this argument, the
Court will not address it. *See Goren v. New Vision, Int'l*, 156 F.3d 721, 726 fn.2 (7th Cir. 1998)
("Perfunctory and undeveloped arguments as well as arguments unsupported by pertinent
authority are waived.").

1074, 1084 (7th Cir. 2008). "Plausibility" in this context does not imply that a court "should decide whose version to believe, or which version is more likely than not." *Swanson v. Citibank, N.A.*, 514 F.3d 400, 404 (7th Cir. 2010). Rather, to survive a motion to dismiss under Rule 12(b)(6), the "plaintiff must give enough details about the subject-matter of the case to present a story that holds together." *Id.* In other words, "the court will ask itself *could* these things have happened, not *did* they happen." *Id.*

### B. Defendants' Rule 12(b)(6) motion to dismiss all claims based on the non-deceptiveness of United Marketing's enrollment process

Defendants also argue that Plaintiffs' claims should be dismissed pursuant to Rule 12(b)(6). Because United Marketing's enrollment process is not deceptive as a matter of law, Defendants assert, Plaintiffs have failed to state a claim upon which relief can be granted. (R. 19, Defs.' Mem. at 6.) This argument relies upon documents that Defendants have requested the Court to take judicial notice of or otherwise consider in ruling on the motion to dismiss. (R. 21, Defs.' Request for Judicial Notice.) As such, the Court will first consider whether it is appropriate to consider the documents attached to Defendants' motion to dismiss before reaching Defendants' Rule 12(b)(6) argument.

Defendants rely upon five documents attached to their motion to dismiss in arguing that Plaintiffs' claims fail as a matter of law: (1) screenshots of the online enrollment page through which Van Tassell purportedly enrolled in Simply Mine; (2) screenshots of the online enrollment page through which Dunn purportedly enrolled in Buyer's Edge; (3) screenshots of the online enrollment page through which Casinover purportedly enrolled in Buyer's Edge; (4) screenshots of the online enrollment page through which Casinover purportedly enrolled in MyAdvisor; and

12

(5) screenshots of the online enrollment page at issue in *In re VistaPrint Corp. Mktg. and Sales Practices Litig.*, MDL No. 4:08-md-1994, 2009 WL 2884727 (S.D. Tex. Aug. 31, 2009). (R. 21, Defs.' Request for Judicial Notice. at 1-2.) Under Rule 12(d) of the Federal Rules of Civil Procedure, the Court cannot consider matters outside the pleadings on a motion under Rule 12(b)(6) without converting the motion into one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). Several exceptions to this rule exist, however, and Defendants argue that these exceptions permit the Court to consider these documents in ruling on the motion to dismiss.

Defendants first request that the Court take judicial notice of the documents under Federal Rule of Evidence 201 ("Rule 201"). (R. 21, Defs.' Request for Judicial Notice.) Under Rule 201, a court may take judicial notice of an adjudicative fact that is not subject to reasonable dispute. Fed. R. Evid. 201. A fact is not subject to reasonable dispute if it "is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." *Id.*

In support of their reliance on Rule 201, Defendants contend, through the affidavit of a United Marketing employee, Glenn Kowalski ("Kowalski"), that the documents in question are the pages through which the Plaintiffs enrolled because "[a]ll consumers who enroll in [United Marketing's] membership services online must complete the webpage enrollment process in [United Marketing's] online enrollment pages." (R. 21, Defs.' Request for Judicial Notice, Ex. A, Kowalski Decl. ¶¶ 4-10.) In response, Plaintiffs have submitted affidavits stating that they did not view any of these enrollment pages over the course of their online product purchases or engage in the enrollment processes described by Defendants. (R. 62, Van Tassell Decl.; R. 63, Doyle Decl.; R. 65, Casinover Decl.; R. 65, Dunn Decl.) Given this dispute, it is not appropriate

13

for the Court to take judicial notice of these documents, aside from the enrollment page in *In re VistaPrint*, which is a matter in the public record. *See Doss v. Clearwater Title Co.*, 551 F.3d 634, 640 (7th Cir. 2008).

Defendants next argue that consideration of the documents is proper because the documents are central to Plaintiffs' complaint. (R. 72, Defs.' Reply.) An exception to Rule 12(d) has developed for documents that are "referred to in the plaintiff's complaint and are central to her claim." *See e.g., Albany Bank & Trust Co. v. Exxon Mobil Corp.*,310 F.3d 969, 971 (7th Cir. 2002) Defendants maintain that this exception has been extended in some cases to include documents that are not specifically referenced in the pleadings, but that are central to the plaintiff's claim and undisputed. (R. 21, Defs.' Request for Judicial Notice at 2, citing *Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir. 2009).) Thus, although Plaintiffs do not mention the enrollment pages in their complaint, Defendants argue that the enrollment pages are central to the allegations in the complaint and therefore should be considered by the Court. (R. 72, Defs.' Reply at 5.)

Even assuming Defendants' expansive interpretation of *Hecker* is correct and, as Defendants' contend, that the documents are central to Plaintiffs' claims, this argument fails for the same reason the Court cannot take judicial notice of the documents: the authenticity of the enrollment pages Defendants seek to rely upon in their motion to dismiss is in question. *See Hecker*, 556 F.3d at 582 (rejecting the argument that the district court erred in considering documents attached to a motion to dismiss because the documents "were concededly authentic," as well as central to the plaintiffs' claim"). Defendants contend that these documents are the actual screenshots viewed by Plaintiffs during the enrollment process; Plaintiffs maintain that

14

they did not view these screenshots at any time during their online purchase on the Merchant Defendants' websites.[6] Although Defendants seek to broaden the exception to Rule 12(d) to include any document "central to Plaintiffs' claims," even if in dispute, there is no support for such an expansive view of the exception. Instead, because the authenticity and accuracy of the documents are in dispute, the Court will not consider them at this stage.[7]

In seeking dismissal pursuant to Rule 12(b)(6), Defendants contend that because United Marketing's online enrollment process is not deceptive as a matter of law, Plaintiffs have failed to state a claim upon which relief can be granted. (R. 19, Defs.' Mem. at 6.) As discussed above, however, the Court cannot consider the documents attached to Defendants' motion to dismiss that Defendants contend contain the screenshots of the enrollment process through which Plaintiffs enrolled at this stage. Accordingly, the Court declines to dismiss Plaintiffs' claims on the grounds that the enrollment process is not deceptive as a matter of law.

Defendants also argue that the first three counts of Plaintiffs' complaint, the ICFA, EFTA, and ECPA claims, fail for additional reasons. (*Id.* at 13.) Plaintiffs concede that their claims under the EFTA as they relate to credit card transactions have no support in the law, and the Court accordingly dismisses Count II as it pertains to credit card transactions. (R. 68, Pls.'

---

[6] For this reason, Plaintiffs' reliance on *In re Vistaprint*, 2009 WL 2884727, and *Baxter v. Intelius, Inc.*, No. SACV 09-1031, 2010 WL 3791487 (C.D. Cal. Sept. 16, 2010) is misplaced. In both cases, the plaintiffs did not dispute the accuracy of the screenshot provided by the Defendant. *In re Vistaprint*, 2009 WL 2884727, at *4, n.5; *Baxter*, 2010 WL 3791487, at *2.

[7] Defendants argue that Plaintiffs do not have a legitimate basis to challenge the authenticity of the documents. (R. 72, Defs.' Reply at 6.) However, the only basis for the authenticity of the documents is the declaration of the United Marketing employee, which is countered by Plaintiffs' declarations. At this stage, it is not appropriate for the Court to determine the authenticity of the documents based on these conflicting declarations.

Resp. at 1, n.3.) The Court will address the remaining arguments pertaining to Plaintiffs' ICFA and ECPA claims in turn.

## B.      Defendants' Rule 12(b)(6) motion to dismiss the ICFA claim (Count I)

In Count I of the complaint, Plaintiffs allege a violation of the ICFA, 815 Ill. Comp. Stat. 505/1 *et seq.*, (R. 10, First. Am. Compl. ¶¶ 51-67), which makes it "unlawful to use deception or fraud in the conduct of trade or commerce." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441 (7th Cir. 2011). Defendants contend that this claim fails because there is an insufficient connection between the alleged wrongful conduct and Illinois, (R. 19, Defs.' Mem. at 13), and cite *Avery v. State Farm Mutual Automobile Insurance Co.*, 835 N.E.2d 801 (Ill. 2005), as support. In *Avery*, the Illinois Supreme Court concluded that the ICFA does not apply to fraudulent transactions which take place outside Illinois. *Id.* at 853. The Court explained that "a fraudulent transaction may be said to take place within a state if the circumstances relating to the transaction occur primarily and substantially within that state." *Id.* Accordingly, an out-of-state plaintiff can pursue a claim under the ICFA "if the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois." *Id.* at 854. In adopting this holding, the Illinois Supreme Court recognized that "there is no single formula or bright-line test for determining whether a transaction occurs within this state." *Id.* Instead, courts consider factors such as where a company is located, where the alleged deception took place, the plaintiff's residence, and where the damage to the plaintiff occurred. *Id.*

Several cases provide examples of the *Avery* test's operation. In *Avery*, the Illinois Supreme Court found that the nonresident plaintiffs could not avail themselves of the ICFA because most of the relevant circumstances underlying the allegedly deceptive conduct had no

16

connection to Illinois. *Id.* While the defendant insurer had its headquarters in Illinois and the deceptive practices were devised and disseminated from those headquarters, the Illinois Supreme Court held those allegations were insufficient as a matter of law to support an ICFA claim. *Id.* Instead, because the consumers did not reside in Illinois, they had received repair estimates in their home states, those repairs were made in their home states, and the alleged deception took place in states other than Illinois, their claims were not actionable under the ICFA. *Id.*

Similarly, in *Phillips v. Bally Total Fitness Holding Corp.*, the Illinois Appellate Court held that the location of the defendant health club's headquarters in Illinois was not dispositive. 865 N.E.2d 310, 315-16 (Ill. App. Ct. 2007). In *Phillips*, the two plaintiffs, who alleged that the defendant had violated the ICFA by refusing to cancel their memberships, resided outside of Illinois, purchased and used the memberships outside of Illinois, and dealt with collection agencies outside of Illinois. *Id.* The Appellate Court accordingly concluded that the plaintiffs and the conduct complained of had insufficient connections to Illinois to maintain a suit under the ICFA. *Id.*

Applying the *Avery* test to this case, the Court concludes that the circumstances that relate to the disputed transaction did not occur "primarily and substantially" in Illinois. First, the parties are primarily located outside of Illinois. None of Plaintiffs reside in Illinois, and of the four defendants, only United Marketing is headquartered in Illinois. (R. 10, First Am. Compl. ¶¶ 6-8, 9-12.) As discussed above, though, whether a defendant's headquarters is located in Illinois is a factor to be considered by the Court, but is far from dispositive. *Avery*, 835 N.E.2d at 854.

Second, nearly all of the conduct related to this claim occurred outside of Illinois. Plaintiffs claim that after they purchased products on the Merchant Defendants' websites, the

17

Merchant Defendants transferred their credit or debit card information to United Marketing, which in turn, enrolled Plaintiffs in the Membership Programs without their knowledge or consent. (R. 10, First Am. Compl. ¶¶ 16-20.) Even assuming these allegations are true, the overwhelming majority of the circumstances relating to these allegations concern events outside of Illinois. Plaintiffs viewed the websites of the Merchant Defendants, all of which are headquartered outside of Illinois, and purchased products from those websites outside of Illinois. Any damage suffered by Plaintiffs did not occur in Illinois, but rather in their home states. Illinois is implicated only because United Marketing is headquartered in Illinois, and is therefore where Plaintiffs argue United Marketing likely planned and carried out its part of the deceptive conduct. Importantly, though, that "a scheme to defraud was 'disseminated' from" United Marketing's headquarters in Illinois is insufficient to establish the necessary connections to Illinois. *Avery*, 835 N.E.2d at 855 (citing *Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 340 (N.D. Ill. 1997) (holding that the ICFA does not apply to the claims of non-Illinois plaintiffs where the only connection to Illinois is the headquarters of the defendant and the fact that a scheme "emanated" from Illinois)).

The Court therefore concludes that Plaintiffs do not have a cognizable cause of action under the ICFA because the circumstances related to the allegedly deceptive conduct as alleged by Plaintiffs did not occur "primarily and substantially" in Illinois. Accordingly, the Court dismisses Count I of the complaint.

**C.     Defendants' Rule 12(b)(6) motion to dismiss the ECPA claim (Count III)**

In Count III of the complaint, Plaintiffs allege that Defendants violated the ECPA, 18 U.S.C. § 2510 *et seq.*, when they intercepted the transmission of data without their knowledge or

18

consent. (R. 10, First Am. Compl. ¶¶ 72-77.) The ECPA imposes liability on anyone who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a). "Intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of an electronic, mechanical, or other device." *Id.* § 2510(4). The purpose of the ECPA is to "protect against the unauthorized interception of electronic communications." *Ameritech Corp. v. McCann*, 297 F.3d 582, 583 (7th Cir. 2002) (citation omitted). Defendants therefore argue that because Plaintiffs voluntarily transmitted their data to the Merchant Defendants, Defendants did not "intercept" Plaintiffs' information. (R. 19, Defs.' Mem. at 15.)

While Defendants may ultimately prevail on the ECPA claim based on Plaintiffs' consensual transmission of their information to the Merchant Defendants, the Court declines to dismiss the ECPA claim at this time for three reasons. First, consent by a party is a defense to the ECPA, and "[c]omplaints need not anticipate or attempt to defuse potential defense." *Doe v. Smith*, 429 F.3d 706, 709 (7th Cir. 2005) ("Smith obviously consented to the recording, but that does not justify dismissing the suit" at the motion to dismiss stage.). Second, as Plaintiffs point out, the consent defense under the ECPA has limits. The pertinent section reads:

> It shall not be unlawful under this chapter for a person . . . to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

18 U.S.C. § 2511(2)(d). Because Plaintiffs may be able to show that Defendants intercepted

Plaintiffs' information "for the purpose of committing any criminal or tortious act," 18 U.S.C. §

2511(2)(d), dismissal is premature at this time. *See Doe*, 429 F.3d at 710. Finally, the cases

relied upon by Defendants in support of the dismissal of this claim—*Crowley v. Cybersource*

*Corp.*, 166 F. Supp. 2d 1263, 1269 (N.D. Cal. 2001), and *In re Vistaprint*, 2009 WL 2884727, at

\*9—are either distinguishable at this stage, or called into doubt by the Seventh Circuit.[8] For

these three reasons, the Court denies Defendants' motion to dismiss as it pertains to Count III of

the complaint at this time.

**D.     Permission Interactive's Rule 12(b)(6) motion to dismiss the EFTA claim
(Count II)**

In addition to Defendants' joint motion to dismiss, Permission Interactive moves to

dismiss Plaintiffs' EFTA claim pursuant to Rule 12(b)(6).[9] (R. 47, PI's Mot. at 1.) The EFTA is

a consumer rights statute that establishes the rights, liabilities, and responsibilities of consumers,

financial institutions, and intermediaries in electronic fund transfer systems. 15 U.S.C. § 1693.

---

[8] In *Crowley*, the court's holding that no "interception" occurred as defined in ECPA rested upon
the fact that no "device" was used by the defendant to obtain the plaintiff's information because
he had voluntarily emailed it to the defendant. 166 F. Supp. 2d at 1269. Defendants here make
no arguments about the use—or lack thereof—of a "device" in this case and instead argue that no
interception occurred because Plaintiffs consented to the communications. This "different
device" requirement, moreover, was criticized by the Seventh Circuit in *United States v.
Szymuszkiewicz*, 622 F.3d 701, 707 (7th Cir. 2010). In *In re Vistaprint*, the court determined that
no interception occurred because the plaintiffs voluntarily submitted their information to the
defendant, and the defendant did not receive that information "for the purpose of committing any
criminal or tortious act." 2009 WL 2884727, at \*9. Here, in contrast, Plaintiffs contend that
Defendants intercepted their information for a tortious purpose. Further, Plaintiffs have not yet
conducted discovery and therefore when or how information was "intercepted" by the various
Defendants is more appropriately addressed at the summary judgment phase.
[9] Permission Interactive also seeks to dismiss the portion of the ICFA claim in Count I as it
alleges a violation of the EFTA. (R. 47, PI's Mot. at 1.) Because the Court has dismissed Count
I for the reasons stated above, the Court need not address this issue here.

It governs electronic fund transfers including automated teller machine transactions, direct deposits and withdrawals, and debit card purchases. *See id.* § 1693a. The EFTA requires that a "preauthorized electronic fund transfer from a consumer's account . . . be authorized by the consumer only in writing" and that "a copy of such authorization . . . be provided to the consumer when made." *Id.* § 1693e. EFTA defines an "electronic fund transfer" as "any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account." *Id.* § 1693a. An "unauthorized electronic fund transfer" is "an electronic fund transfer from a consumer's account initiated by a person other than the consumer without actual authority to initiate such transfer and from with the consumer receives no benefit." *Id.* § 1693a.

Plaintiffs allege that Permission Interactive and the other Defendants violated the EFTA by "initiat[ing] electronic transfers of funds for unauthorized Membership Programs" from Casinover's debit card account "on a recurring basis, at substantially regular intervals, without first obtaining written authorization from [her] or providing [her] with a copy of any such purported authorization."[10] (R. 10, First Am. Compl. ¶¶ 69-71.) Permission Interactive, however, argues that the Court should dismiss this claim because, according to Plaintiffs' own complaint, Permission Interactive did not "initiate" any "electronic fund transfer from a consumer's account" as required by the EFTA. (R. 48, PI's Mem. at 1.) Thus, Permission Interactive argues, Plaintiffs have failed to allege an essential element of an EFTA claim. (*Id.*)

---

[10] As mentioned above, Plaintiffs acknowledge that there is no basis in the law for their EFTA claim based on credit card transactions. Casinover is the only named plaintiff who used a debit card for her purchase, and the only named plaintiff who made a purchase from Permission Interactive.

Based on the allegations in the complaint, the Court agrees that Permission Interactive is not liable to the Plaintiffs under the EFTA. The "electronic fund transfers" Casinover complains of were those debited by United Marketing, not Permission Interactive. Casinover does not claim that her payment to Permission Interactive for the product she purchased from its website was unauthorized or otherwise in violation of the EFTA. Instead, while Plaintiffs claim in a conclusory fashion in Count II that all Defendants violated the EFTA by "initiat[ing] electronic transfers of funds" that failed to comport with the requirements of the EFTA, Plaintiffs fail to plead any facts indicating Permission Interactive "initiated" those unauthorized transfers. Rather, the allegations in the complaint indicate that while Permission Interactive provided United Marketing with Casinover's debit card information, it was United Marketing that initiated and carried out the electronic transfer that debited Casinover's account for the Membership Programs. (*See, e.g.,* R. 10, First Am. Compl. ¶¶ 1-2, 16-18, 21, 27, 29-30, 34, 36-37, 44.)

Plaintiffs do not dispute that the charges at issue in this case were debited from Casinover's account by United Marketing, not Permission Interactive. Nevertheless, they argue that Permission Interactive is liable under the EFTA under a broad interpretation of the term "initiate." (R. 69, Pls.' Resp. at 5.) Specifically, Plaintiffs argue that the Court should conclude that a defendant "violates the EFTA where it interacts with a plaintiff by electronic means and ultimately begins (and is essential to) the process that leads to an unauthorized electronic fund transfer, regardless of whether the defendant or some co-actor actually removes the funds from the plaintiff's bank account." (*Id.* at 5-6.) Plaintiffs, however, fail to identify any support for this expansive interpretation of the statute in the language of the statute itself, the regulations, the official commentary, or any case law interpreting the EFTA. Lacking this support, Plaintiffs urge

the Court to look to the ordinary use of the term "initiate," as well as its use in other statutory

provisions. (*Id.* at 6.) The Court finds that neither argument supports Plaintiffs' position.

Plaintiffs also claim that the Federal Trade Commission ("FTC"), which enforces provisions of

the EFTA, has adopted their interpretation of the EFTA. (*Id.* at 7.) A review of the complaints

from the cases cited by Plaintiffs in support of this contention, however, belies the truth of that

statement; none of the FTC complaints alleged that a defendant violated the EFTA by obtaining

debit card information and passing it to an unrelated entity. Instead, all of the cases involved

defendants that had allegedly violated the EFTA through the actual charging of the debit cards of

consumers in violation of the EFTA. (*See* R. 71, Pl's Reply, Exs. 2-10.)

In rejecting Plaintiffs' proffered interpretation of "initiate," the Court does not deny that

Plaintiffs allege wrongdoing on the part of Permission Interactive. The narrow question here,

however, is whether Permission Interactive is liable under the EFTA for providing Casinover's

debit card information to United Marketing without her knowledge and consent, as Plaintiffs

suggest. In the absence of evidence of Congressional intent indicating otherwise, though, this

"aiding and abetting" theory of liability is foreclosed by the Supreme Court's decision in *Central

Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 181-82 (1994). In

*Central Bank*, the Supreme Court addressed whether a private right of action was available under

Section 10(b) of the 1934 Securities Exchange Act against defendants who had allegedly aided

and abetted a violation of the Act but who were not themselves charged with primary violations.

*Id.* The Court stated that because "Congress has not enacted a general aiding and abetting statute

. . . when Congress enacts a statute under which a person may sue and recover damages from a

private defendant for the defendant's violation of some statutory norm, there is no general

23

presumption that the plaintiff may also sue aiders and abettors." *Id.* at 182 (citation omitted).

Accordingly, the Supreme Court concluded that because Congressional intent for a civil cause of

action for aiding and abetting could not be found in the text of the statute, the plaintiff could not

maintain an aiding and abetting suit under Section 10(b). *Id.* at 183, 191.

The same conclusion applies here. While Plaintiffs clearly allege that Permission

Interactive aided and abetted United Marketing in violating the EFTA, the EFTA does not

provide for aider and abettor liability. *See In re Easysaver Rewards Litig.* 737 F. Supp. 2d 1159,

1181 (S.D. Cal. 2010) ("The Court concludes the EFTA does not reach those who aid and abet a

statutory violation."). The Court therefore dismisses Plaintiffs' EFTA claim in Count II as it

pertains to Permission Interactive.

Permission Interactive also requests attorneys' fees and cost pursuant to Section 1693m(f)

of the EFTA. (R. 48, PI's Mem. at 1.) Section 1693m(f) provides that "[o]n a finding by the

court that an unsuccessful action under this section was brought in bad faith or for purposes of

harassment, the court shall award to the defendant attorney's fees reasonable in relation to the

work expended and costs." 15 U.S.C. § 1693m(f). While the Court rejects Plaintiffs' proposed

extension of the EFTA, the Court does not find that the EFTA claim was brought by Plaintiffs in

bad faith or for purposes of harassment, and therefore denies Permission Interactive's request for

attorney's fees.

## III.    Motions to Compel Arbitration

In the alternative to dismissal under Rules 12(b)(1) and 12(b)(6), Defendants jointly and

Pikes Peak individually request the Court to compel arbitration and stay the lawsuit pending the

outcome of arbitration pursuant to the FAA, 9 U.S.C. § 1 *et seq.* (R. 19, Defs.' Mem. at 10.)

24

After setting forth the legal standards applicable to motions to compel arbitration, the Court considers each motion in turn.

### A.    Legal Standards

The Federal Arbitration Act was enacted to "reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 288-89 (2002) (citing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991)). The FAA broadly provides that a written provision in "a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon grounds as exist at law or equity for the revocation of any contract." 9 U.S.C. § 2. The FAA provides for stays of proceedings in federal district courts when an issue in the proceeding is referable to arbitration, and for orders compelling arbitration when one party has failed or refused to comply with an arbitration agreement. *Waffle House*, 534 U.S. at 289.

Before staying an action and ordering arbitration, however, the Court must determine whether the parties agreed to arbitrate the dispute in question. *Granite Rock Co. v. Int'l Bros. of Teamsters*, 130 S.Ct. 2847, 2856 (2010). The Supreme Court recently emphasized the "first principle that underscores all of [its] arbitration decisions: Arbitration is strictly a matter of consent, and thus is a way to resolve those disputes—*but only those disputes*—that the parties have agreed to submit to arbitration." *Granite Rock Co.*, 130 S.Ct. at 2857 (internal quotation marks and citations omitted). Accordingly, the Court should order arbitration only when it is satisfied "that neither the formation of the parties' arbitration agreement *nor* . . . its enforceability

or applicability to the dispute is in issue." *Id.* at 2858. Put differently, the party seeking to

compel arbitration must establish that the parties' arbitration agreement was validly formed,

covers the dispute in question, and is legally enforceable. *Id.*; *see also Zurich Am. Ins. Co. v.*

*Watts Indust., Inc.*, 466 F.3d 577, 580 (7th Cir. 2006). When these matters are contested, the

Court must resolve the disagreement.[11] *Id.*

If the Court is satisfied that the parties agreed to arbitrate, it must promptly compel

arbitration. 9 U.S.C. § 4. If, however, the making of the arbitration agreement is "in issue, the

court shall proceed summarily to a trial thereof." *Id.* While the FAA does not expressly identify

the evidentiary standard a party seeking to avoid compelled arbitration must meet, most courts

apply a standard similar to "that required of a party opposing summary judgment under Rule

56(e) of the Federal Rules of Civil Procedure for a motion for summary judgment: the opposing

party must demonstrate that a genuine issue of material fact warranting a trial exists." *Tinder v.*

*Pinkerton Security*, 305 F.3d 728, 735 (7th Cir. 2002) (citations omitted); *see also Bensadoun v.*

*Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003); *Aliron Int'l, Inc. v. Cherokee Nation Indust., Inc.*,

531 F.3d 863, 865 (D.C. Cir. 2008). Accordingly, "[t]he party opposing arbitration must identify

a triable issue of fact concerning the existence of the agreement in order to obtain a trial on the

merits of the contract." *Id.* Just as with motions for summary judgment, in deciding whether

there is a genuine issue of material fact for trial, the evidence of the party opposing compelled

arbitration "is to be believed and all justifiable inferences are to be drawn in is favor." *Id.*

---

[11] Absent "clear and unmistakable evidence" if an agreement to arbitrate arbitrability, it is for the courts to resolve this foundational issue. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see also Janiga v. Questar Capital Corp.*, 615 F.3d 735, 742 (7th Cir. 2010) ("[I]t is similarly well settled that where the dispute at issue concerns contract formation, the dispute is generally for courts to decide.") (citation omitted). Defendants do not suggest that the arbitrability question was designated to the arbitrators rather than the courts.

(internal quotation marks and citations omitted). A party cannot avoid compelled arbitration, however, "by generally denying the facts upon the right to arbitrate rests; the party must identify specific evidence in the record demonstrating a material factual dispute for trial." *Id.* (citation omitted).

### B.    Defendants' joint motion to arbitrate

Applying these principles, the Court first considers Defendants' joint motion to compel arbitration of all Plaintiffs' claims. (R. 18, Defs.' Mot.) Defendants contend that Plaintiffs must be compelled to arbitrate based on the arbitration provision in the "Terms and Conditions" purportedly displayed on the various websites used by Plaintiffs prior to their enrollment in the Membership Programs. (R. 19, Defs.' Mem. at 11, *citing* R. 21, Kowalski Decl., Exs. E-F ¶ 12.) Specifically, Defendants point to the arbitration provision found in the Terms and Conditions of the Buyer's Edge and Simply Mine Membership Programs.[12] (*Id.*) Defendants argue that because the "broad arbitration clause" in the Terms and Conditions covers "[a]ny controversy or claim arising out of or relating to this Agreement," and Plaintiffs claims relate to their subscriptions to United Marketing Membership Programs, Plaintiffs' claims are subject to arbitration. (*Id.* at 12.) Plaintiffs, however, argue that Defendants have failed to establish the foundational requirement to compel arbitration: the existence of a valid agreement to arbitrate. (R. 68, Pls.' Resp. at 10.)

---

[12] Both provisions provide in relevant part that:
> All legal issues arising from or related to the use of your Membership and this Site shall be construed in accordance with the laws of the State of Illinois applicable to contracts entered into and wholly to be performed within Illinois. Any controversy or claim arising out of or relating to this Agreement or your use of the Site shall be settled by binding arbitration in accordance with the commercial arbitration rules of the American Arbitration Association ("AAA").

(R. 21, Kowalski Decl., Exs. E-F ¶ 12.)

The Court agrees that Defendants have put the cart before the horse in arguing that the scope of the arbitration agreement encompasses Plaintiffs' claims before establishing the existence or validity of any agreement. Before addressing the scope of an arbitration agreement, the Court must first address the threshold inquiry of "whether a contract exists" between the parties to arbitrate. *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 742 (7th Cir. 2010).

Contract formation is governed by state law. *Id.* (citing *First Options of Chi.*, 514 U.S. at 944). In Illinois, arbitration agreements are analyzed using ordinary principles of contract law.[13] *Carey v. Richards Bldg. Supply Co.*, 856 N.E.2d 24, 27 (Ill. App. Ct. 2006). This analysis "begin[s] with addressing whether the 'basic ingredients' of a contract—offer, acceptance, and consideration—are present." *Id.* Here, the parties dispute that these "basic ingredients" exist in this case. Defendants maintain that Plaintiffs enrolled in United Marketing's services through United Marketing's enrollment web pages and agreed to the Terms and Conditions that include an arbitration clause. (R. 72, Defs.' Reply at 10.) Plaintiffs, on the other hand, contend in sworn declarations that they never saw the enrollment web pages or the Terms and Conditions, let alone agreed to be bound by them. (R. 68, Pls.' Resp. at 13.) Given this fundamental dispute regarding the existence of an agreement to arbitrate, the Court cannot compel arbitration at this time. *See Deputy v. Lehman Bros.*, 345 F.3d 494, 509-10 (7th Cir. 2003) (remanding case for trial where factual dispute existed as to the validity of a party's signature on the relevant contract).

Seeking to avoid this result, Defendants claim that Plaintiffs cannot plausibly deny that they enrolled in United Marketing's services through the enrollment web pages and agreed to

---

[13] While which state's law should apply is not entirely clear, both parties apply Illinois law to the dispute, and the Court will do the same.

28

United Marketing's Terms and Conditions. (R. 72, Defs.' Reply at 10.) In support of this

contention, Defendants point out that United Marketing has Plaintiffs' email addresses and cite

their response to one of Plaintiffs' interrogatories, which they claim states that "[United

Marketing] has records of when Plaintiffs visited the respective [United Marketing] web pages

and from which [Internet Protocol ("IP")] addresses." (*Id.*) If this were an accurate description

of United Marketing's interrogatory response, the Court would likely agree with Defendants that

Plaintiffs could not plausibly claim they never saw the enrollment web pages or agreed to enroll

in a Membership Program. A close reading of Defendants' response to the interrogatory,

however, does not evince that Plaintiffs viewed the respective enrollment web pages and

indicated acceptance of the Terms and Conditions. Instead, the response indicates that United

Marketing has Plaintiffs' unique IP addresses, "time stamps confirming the time of enrollment,"

and email addresses corresponding with each of Plaintiffs' accounts.[14] (R. 68, Pls.' Resp., Ex. A

at 15.) Admittedly, a plausible explanation for United Marketing having this information in its

possession is that Plaintiffs viewed the enrollment web pages, provided their email addresses as

an electronic signature, and clicked on a link indicating their agreement to enroll in a

Membership Agreement under the relevant Terms and Conditions. Another possible

explanation, however, is the one alleged by Plaintiffs: that the Merchant Defendants provided

this information to United Marketing without Plaintiffs' knowledge or consent. Under this

explanation, which Plaintiffs claim is the correct one in their sworn affidavits, Plaintiffs never

even viewed the enrollment pages or the relevant Terms and Conditions, let alone agreed to

them. Accordingly, for all the reasons contained herein, the Court denies Defendants' joint

---

[14] Defendants do not have the IP address for Casinover because it was retained by Permission
Interactive. (R. 68, Pls.' Resp., Ex. A at 15.)

motion to compel arbitration without prejudice because there is a genuine issue of material fact

pertaining to whether Plaintiffs ever viewed the enrollment web pages containing the Terms and

Conditions upon which Defendants rely. Defendants may file a new motion to compel

arbitration if this lawsuit cannot be settled, and the Court will promptly set the new motion for a

required evidentiary hearing for all the reasons contained herein.

### C.     Pikes Peak's motion to compel arbitration

Pikes Peak individually seeks to compel arbitration of Van Tassell's claims, the only

Plaintiff who alleges to have had any dealings with Pikes Peak through her use of the

ChefsCatalog.com website, which is owned and operated by Pikes Peak. (R. 24, PP's Mot.)

Once again, the threshold issue before the Court is whether Van Tassell agreed to arbitrate her

claims. Pikes Peak maintains that Van Tassell agreed to the "Conditions of Use, Notices and

Disclaimers" ("Conditions of Use") set forth on the ChefsCatalog.com website, which included

arbitration and choice of law provisions, by using the ChefsCatalog.com website. (R. 35, PP's

Mem. at 2.) Van Tassell, however, disputes that she ever saw the Conditions of Use when

making purchases on ChefsCatalog.com, and did not know that she would be required to submit

any disputes to binding arbitration.[15] (R. 62, Van Tassell Decl. ¶¶ 10-11.) Pikes Peak does not

quarrel with Van Tassell's assertion that she had no actual knowledge of the Conditions of Use,

and instead argues that she had constructive knowledge of the Conditions of Use because they

were hyperlinked on the ChefsCatalog.com website. (R. 35, PP's Mem. at 7-9.) Van Tassell, in

---

[15] There is a dispute as to whether it was Van Tassell or her partner, Dennis Doyle ("Doyle"), who used Van Tassell's credit card for the purchase on ChefsCatalog.com that allegedly led to her enrollment in a United Marketing Membership Program. Because both Van Tassell and Doyle deny ever seeing the Conditions of Use, and Pikes Peak has failed to make any argument as to how this dispute affects the outcome of this motion, the Court will refer only to Van Tassell for purposes of resolving the motion to arbitrate.

turn, does not dispute that the Conditions of Use are hyperlinked on ChefsCatalog.com, but argues that they were not "sufficiently conspicuous" to provide adequate notice that they were part of any contract. (R. 67, Pls.' Resp. at 7.) Before delving into whether Van Tassell is bound by the Conditions of Use on the ChefsCatalog.com website, the Court sets forth principles of contract formation as applied in the internet age.[16]

The making of contracts over the internet "has not fundamentally changed the principles of contract." *Register.com v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004). Thus, the basic tenet of contract law remains unchanged: in order to be binding, a contract requires a "meeting of the minds" and a manifestation of "mutual assent." *Agritrack, Inc. v. DeJohn Housemoving, Inc.*, 25 P.3d 1187, 1192 (Colo. 2001) (a valid contract is created when there is a "meeting of the minds" between the parties as to all essential terms of the contract); *Brush Creek Airport, LLC v. Avian Park, LLC*, 57 P.3d 738, 745 (Colo. App. 2002) (a contract exists only when there was mutual assent to all essential terms).[17] This requirement of manifestation of assent applies with equal force to arbitration agreements; thus, "[c]larity and conspicuousness of arbitration terms are important in securing informed assent." *Specht v. Netscape Commc'ns. Corp.*, 306 F.3d 17, 30 (2d Cir. 2002) (applying California law).

---

[16] Given this lack of dispute over the material facts at issue in this motion, a trial to determine arbitrability is not required. *See Am. Int'l Specialty Life Ins. Co. v. Elec. Data Sys. Corp.*, 347 F.3d 665, 671 (7th Cir. 2003). The parties do not contend otherwise.

[17] Once again, the state law to be applied to this dispute is not clear. Pikes Peak urges the Court to apply Colorado law, and Plaintiffs do not object to the use of Colorado law. Neither party contends that the choice of law determination would affect the outcome of this case, however, and both cite cases from jurisdictions other than Colorado. Because "[t]he principles of contract construction in this case are matters of hornbook law," *James v. McDonald's Corp.*, 417 F.3d 672, 677 n.2 (7th Cir. 2005) (internal quotation marks and citations omitted), the Court agrees that the choice of law will not affect the outcome of this dispute, but will nonetheless apply Colorado law in resolving this dispute.

On the internet, several means of demonstrating mutual assent have developed. The two most common types of agreements are "clickwrap" agreements and "browsewrap" agreements. With clickwrap agreements, the webpage user manifests assent to the terms of a contract by clicking an "accept" button in order to proceed. *See* Ronald J. Mann, *Just One Click: The Reality of Internet Retail Contracting*, 108 Colum. L. Rev. 984, 990 (2008) ("Clickwrap" includes "the following types of interfaces: terms within a frame through which a use must scroll to get to a radio button that must be checked to proceed; terms within a frame and a radio button outside and below that frame that must be checked to proceed; and a statement that the purchase is subject to terms and conditions, a link to those terms, and a radio button that must be checked to proceed."). Because clickwrap agreements require affirmative action on the part of the user to manifest assent, courts regularly uphold their validity when challenged. *Id.*

Browsewrap agreements, the second main type of online contract, is the type of agreement at issue in this motion. Unlike with clickwrap agreements, browsewrap agreements do "not require the user to manifest assent to the terms and conditions expressly—the user need not sign a document or click an 'accept' or 'I agree' button." *Southwest Airlines v. Boardfirst, L.L.C.*, 06-CV-0891-B, 2007 WL 4823761, at *4 (N.D. Tex. Sept. 12, 2007). Instead, browsewrap agreements typically "involve a situation where notice on a website conditions use of the site upon compliance with certain terms or conditions, which may be included on the same page as the notice or accessible via a hyperlink." *Id.* Thus, a party gives his or her assent simply by using the website. *Id.* (citing *Pollstar v. Gigmania, Ltd.*, 170 F. Supp. 2d 974, 981 (E.D. Cal. 2000)). Because no affirmative action is required by the website user to agree to the terms of a contract other than his or her use of the website, the determination of the validity of a

32

browsewrap contract depends on whether the user has actual or constructive knowledge of a website's terms and conditions. *Id.* at \*5 (citing Mark A. Lemley, *Terms of Use*, 91 Minn. L. Rev. 459, 477 (Dec. 2006) ("Courts may be willing to overlook the utter absence of assent only when there are reasons to believe that the [website user] is aware of the [website owner's] terms."); Tarra Zynda, Note, *Ticketmaster Corp. v. Tickers.com, Inc.: Preserving Minimum Requirements of Contract on the Internet*, 19 Berkeley Tech. L.J. 495, 507 (2004) ("[S]o far courts have held browsewrap agreements enforceable if the website provides sufficient notice of the license.")). Thus, absent a showing of actual knowledge of the terms by the webpage user, the validity of a browsewrap contract hinges on whether the website provided reasonable notice of the terms of the contract. *See, e.g., id.*; *Specht*, 306 F.3d at 32.

A few cases illustrate this principle. The seminal browsewrap case is *Specht v. Netscape Communications Corp.*, a case in which the Second Circuit applying California law addressed whether the plaintiffs who had downloaded software from the defendants' webpage had agreed to be bound by the arbitration clause found in the software's license terms, which were only visible to the plaintiffs by scrolling down the webpage to a screen located below the download button. 306 F.3d at 20. The Second Circuit rejected the defendants' argument that a "fair and prudent person using ordinary care" would have been on inquiry notice of the license terms. *Id.* at 31. Instead, because nothing required the plaintiffs to unambiguously manifest assent and the reference to the existence of the license terms was on a submerged screen, the Court concluded that "a reasonably prudent" Internet user in the plaintiffs' position "would not have known or learned, prior to acting on the invitation to download, of the reference to [the] license terms hidden behind the 'Download' button on the next screen." *Id.* at 35. Thus, because the

33

defendants did not provide reasonable notice of the license terms, the plaintiffs' "bare act of downloading the software did not unambiguously manifest assent to the arbitration provision" contained in the terms. *Id.*

In *Hubbert v. Dell Corp.*, the Illinois Supreme Court also considered whether an arbitration provision contained in the "Terms and Conditions of Sale" on the defendant's website was part of the parties' contract created by plaintiffs' purchase on the website. 835 N.E.2d 113, 120 (Ill. 2005) (applying Texas law). Unlike in *Specht*, the terms were visibly referenced several times throughout the order process: the blue hyperlink entitled "Terms and Conditions of Sale" was evident on each of the five online forms the plaintiffs completed to make their purchases. *Id.* at 118. The hyperlinks to the "Terms and Conditions of Sale" also appeared on the defendant's marketing web pages, copies of which the plaintiffs had attached to their complaint. *Id.* at 121. Finally, on the last three forms the plaintiffs completed online, the following statement appeared: "All sales are subject to Dell's Term[s] and Conditions of Sale." *Id.* at 118. This statement, the court found, "would place a reasonable person on notice that there were terms and conditions attached to the purchase and that it would be wise to find out what the terms and conditions were before making a purchase." *Id.* at 122. The Illinois Supreme Court concluded that this statement "combined with making the 'Terms and Conditions of Sale' accessible online with blue hyperlinks was sufficient notice to the plaintiffs that purchasing the computers online would make the 'Terms and Conditions of Sale' binding on them." *Id.*

In *PDC Laboratories, Inc. v. Hach Co.*, a case cited by Pikes Peak, a court in the Central District of Illinois evaluated a browsewrap contract under Colorado law that the plaintiff claimed was unconscionable because the disputed terms were not sufficiently conspicuous. No. 09-1110,

34

2009 WL 2605270, at *2 (C.D. Ill. 2009). Though the court applied a standard similar to that set forth in *Specht*, that "a term in a contract is conspicuous if it is presented in a manner 'that a reasonable person against which it is to operate ought to have noticed it,'" *id.* at *2 (citing Colo. Rev. Stat. § 4-1-201(b)(1)(West 2009)), it reached the opposite conclusion due to the fact that the hyperlinked terms were evident on multiple web pages throughout the order process. *Id.* at *3. Specifically, the terms at issue were hyperlinked on three separate pages of the order process in "underlined, blue, contrasting text." *Id.* Additionally, the terms were "specifically referenced in the final order step which read: 'STEP 4 of 4: Review terms, add any comments, and submit order,' and was followed by a hyperlink to the Terms." *Id.* Given these facts and relying on *Hubbert*, the court concluded that the terms "were conspicuous enough to have been included and that such inclusion in the contract was not to be considered procedurally unconscionable. *Id.*

In this case, Pikes Peak argues that because Van Tassell used the website and made a purchase on the website, she agreed to be subject to the Conditions of Use found on the website, which mandate arbitration of all disputes. (R. 35, PP's Mem. at 2.) While Pikes Peak does not put forth any evidence that Van Tassell actually knew of the existence of the Terms and Conditions before making her purchase or while using the website, Pikes Peak argues that the notice provided on ChefsCatalog.com of the Conditions of Use "falls squarely within the rules of decision set forth in *PDC Laboratories* and *Hubbert*," and thus Van Tassell is bound by the terms. (*Id.* at 8.) In support, Pikes Peak provides the affidavit of James Gaston ("Gaston"), Pikes Peak's Chief Operating Officer, and the screenshots of the home page of ChefsCatalog.com, the Customer Service page, the Secure Check Out pages, and the Conditions of Use found on the website. (R. 35, PP's Mem., Exs. A-D.)

35

Contrary to Pikes Peaks' assertions, however, a review of these web pages and hyperlinks connecting them shows that the notice of the Conditions of Use on ChefsCatalog.com is far less conspicuous than the notice in the cases upon which Pikes Peak relies. Unlike in either *Hubbert* or *PDC Laboratories*, a hyperlink to the Conditions of Use does not appear on either the home page or the check out pages. Instead, a user only encounters the Conditions of Use after scrolling to the bottom of the home page and clicking the "Customer Service" link, and then scrolling to the bottom of the Customer Service page or clicking the "Conditions of Use, Notices & Disclaimers" link located near the end of a list of links on the page. (R. 35, PP's Mem., Gaston Decl. ¶ 3 ("Exhibit A is a true and correct copy of the Chefs Catalog home page, containing hyperlinks to, among other things, the Customer Service page, which, in turn, contains hyperlinks to the terms and conditions that apply to the purchase of products from the Chefs Catalog website.").) Given the multiple steps necessary to finding the Conditions of Use, the Court finds that the Conditions of Use at issue here are even less obvious than those in *Specht*: instead of merely scrolling down to find the terms on a submerged screen when there was no reason to do so, the users of ChefsCatalog.com, also without any reason to do so, must scroll down the home page, make the illogical leap that "Customer Service" means binding "Conditions of Use" and click on that link. They must next scroll down a lengthy page containing unrelated information to find the Conditions of Use, or click on the "Conditions of Use, Notice & Disclaimers" link sandwiched between "Price Adjustments" and "CHEFS Gift Card & Product Giveaway" links. It may be true, as Pikes Peak claims, that the Customer Service page containing the Conditions of Use at the bottom of the page is accessible through numerous hyperlinks, including links such as "help," "customer service hours," "Catalog or Coupon Code," "Shipping Information," "Holiday

36

Deliver," or "Return Policy," (R. 70, PP's Reply at 6), but Pikes Peak fails to provide any

explanation as to why a user of ChefsCatalog.com would logically click on any of those links to

find the Conditions of Use, especially when they are not mentioned anywhere else on the site.

*See Sotelo v. Directrevenue, LLC*, 384 F. Supp. 2d 1219, 1228 (N.D. Ill. 2005) (rejecting the

defendants' argument that the plaintiff had the opportunity to view the user agreement when the

"small button with question mark in the corner of pop-advertisements" did not indicate that it

linked to information about the user agreement).

      This multi-step process to find the Conditions of Use is especially problematic because

ChefsCatalog.com lacks any reference to the existence of the Conditions of Use or that they are

binding on all users of the website outside of the Conditions of Use themselves. *Contra*

*Hubbert*, 835 N.E.2d at 118 ("All sales are subject to Dell's Term[s] and Conditions of Sale"

appeared on the last three forms the plaintiffs completed online); *PDC Laboratories*, 2009 WL

2605270, at *3 (The final order step read: "STEP 4 of 4: Review terms, add any comments, and

submit order," and was followed by a hyperlink to the Terms.); *see also Hines v. Overstock*, 668

F. Supp. 2d 362, 367 (E.D. N.Y. 2009), *aff'd*, 380 Fed. Appx. 22 (2d Cir. 2010) ("Notably,

unlike in other cases where courts have upheld browsewrap agreements, the notice the 'Entering

this Site will constitute your acceptance of these Terms and Conditions,' . . . was only available

within the Terms and Conditions."). This does not mean that the lack of a warning or reference

to the terms at check out or elsewhere on a webpage makes a browsewrap contract *per se*

unenforceable. Instead, in this case, the absence of any reference to the Conditions of Use

coupled with the multi-step process to locate the Conditions of Use means that, like the plaintiffs

in *Specht*, users of the ChefsCatalog.com website could complete their purchases without ever

having notice that their purchases are subject to the website's Conditions of Use. *See also Hines*, 668 F. Supp. 2d at 367 ("[The plaintiff] lacked notice of the Terms and Conditions because the website did not prompt her to review the Terms and Conditions and because the link to the Terms and Conditions was not prominently displayed so as to provide reasonable notice of the Terms and Conditions."). While internet users are bound by the terms of a website for which they have reasonable notice, Van Tassell's failure to scour the website for the Conditions of Use she had no notice existed does not constitute assent. Accordingly, the Court finds that because the ChefsCatalog.com website fails to provide reasonable notice of the Conditions of Use, there was not a valid agreement to arbitrate. Pikes Peaks' motion to compel arbitration is therefore denied.[18]

## CONCLUSION

For the foregoing reasons, Permission Interactive's motion to join the motion to dismiss (R. 45) is GRANTED. Defendants' motion to dismiss (R. 18) is granted in part and denied in part. The motion is GRANTED as to Count I of the complaint, and DENIED with respect to the remaining counts. Defendants' motion to compel arbitration and stay the proceedings (R. 18) is DENIED without prejudice to its renewal. Permission Interactive's motion for dismissal of Plaintiffs' EFTA claim in Count II (R. 47) is GRANTED. Pikes Peak's motion to compel arbitration (R. 24) is DENIED. In sum, Count I is dismissed against all defendants, and Count II is dismissed against Permission Interactive and against all defendants as it pertains to credit card transactions.

---

[18] Because the Court concluded that there was no valid agreement to arbitrate, it does not address Plaintiffs' other arguments pertaining to the scope and enforceability of the agreement.

The parties are directed to reevaluate their settlement positions in light of this opinion and to exhaust all efforts to settle this case. The parties shall appear for a status on August 4, 2011 at 9:45 a.m. to set a firm litigation schedule unless this Court is informed that this lawsuit has been settled.

Entered: _____

Judge Ruben Castillo
United States District Court

**Dated:** July 5, 2011

39